CORAL CONSTRUCTION COMPANY, et al., Plaintiffs,

v.

KING COUNTY, Defendant.

No. C89–1488WD.

United States District Court,
W.D. Washington,
at Seattle.

Dec. 4, 1989.

Jack Gaylord Johnson, Seattle, Wash., for defendant.

John F. Bradach, Stoel, Rives, Boley, Jones & Grey, Seattle, Wash., and Paul A. D'Aloisio, Stoel, Rives, Boley, Jones & Grey, Portland, Or., for plaintiffs.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

DWYER, District Judge.

Plaintiffs and defendant have filed cross-motions for summary judgment. The parties agree that no disputes of fact exist and that this case will be fully decided on the

present record. The court has considered all materials filed by the parties and has heard oral argument of counsel. A number of letters from non-parties have been received; these cannot be considered and have been placed in the chambers file. Being fully advised, the court now finds and rules as follows:

## I. BACKGROUND

On May 1, 1989, the King County Council passed an ordinance amending the county's set-aside program for minority- and women-owned business enterprises ("MWBE's"). Proceedings of the King County Council Regular Meeting, Record at 1, 2 (May 1, 1989); King County, Wash., Code ch. 4.18. The program provides two methods by which MWBE's may receive preferences in bidding on county contracts. Under one method, contractors whose bids are within five percent of the lowest responsive bid are given preference in the award of the contract if their bids show that they are MWBE's or will use MWBE's on the project. King County, Wash., Code § 4.18.060(A)(1) ("percentage preference method"). Thus, an MWBE whose bid was five percent higher than the lowest responsive bid could nevertheless be awarded the contract over a low bidder who was not a MWBE.

Under the other set-aside method, contractors for county contracts of more than $10,000 must, with certain exceptions and limitations, use MWBE's for particular percentages of work on those contracts. King County, Wash., Code § 4.18.060(A)(2).

Plaintiff Coral Construction Company was the low bidder on a King County guardrail construction contract. Applying the percentage preference method,[1] the county awarded the contract to a minority business enterprise ("MBE"), whose bid was higher than that of Coral Construction.

Coral Construction and an Oregon chapter of the Associated General Contractors of America, Inc., brought this suit claiming that King County's set-aside program, on its face and as applied to Coral Construction, violates plaintiffs' equal protection rights. Plaintiffs rely on a recent case, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), in which the Supreme Court ruled that a municipal set-aside program violated the equal protection clause.[2]

In *Croson* the Court examined a set-aside program adopted by the city of Richmond, Virginia. The Richmond program required prime contractors to award at least 30 percent of the dollar amount of each city construction contract to MBE's. *Id.* at ——, 109 S.Ct. at 707.

Government classifications based on race may be employed only if justified by compelling government interests, and if their use is necessary to accomplishing their legitimate purpose. *Palmore v. Sidoti*, 466 U.S. 429, 432–33, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984). Remedying the effects of past discrimination can represent such a compelling interest. *See Croson*, 488 U.S. at ——, 109 S.Ct. at 720 (plurality opinion). A majority[3] of the Court in *Croson* agreed that strict scrutiny is required in judicial review of race-based affirmative action programs, in order to " 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant

---

1. The percentage preference method was used notwithstanding the contract's value of more than $10,000. *See* King County, Wash., Code § 4.18.060(C) (county department may use alternate set-aside method if alternate is "more feasible method of achieving" MWBE utilization goal).

2. The equal protection clause provides: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

3. A majority of the court adopted parts I, III–B, and IV of Justice O'Connor's opinion, which addressed the background of the case, the evidence supporting Richmond's program, and the "narrow tailoring" requirement, respectively. *Croson*, —— U.S. at ——, 109 S.Ct. at 712–17, 723–29. Two Justices joined in part II of Justice O'Connor's opinion, while three joined in parts III–A and V of that opinion. Two Justices filed opinions concurring in parts of the opinion and concurring in the judgment. Justice Scalia concurred in the judgment. Three Justices dissented.

use of a highly suspect tool." *Id.* at ——, 109 S.Ct. at 721 (plurality opinion); *id.* at ——, 109 S.Ct. at 735 (Scalia, J., concurring in the judgment). In other words, courts must strictly scrutinize the use of racial classifications to determine whether the compelling interest relied upon by the government actually exists and suffices.

Applying this standard, the Court found that Richmond's set-aside program (1) was not supported by adequate evidence of past discrimination to establish Richmond's compelling interest; and (2) was not tailored narrowly enough to its goal of remedying the effects of past discrimination. *Id.* at ——, 109 S.Ct. at 723-29.

The *Croson* Court did not, however, conclude that race-based set-aside programs violate the equal protection clause per se. Justice O'Connor stated: "Nothing we say today precludes a state or local entity from taking action to rectify the effects of identified discrimination within its jurisdiction.... In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion." *Id.* at ——, 109 S.Ct. at 729 (plurality opinion). A majority of the court agreed with this statement. *See id.* at ——, 109 S.Ct. at 734 (Kennedy, J., concurring); *id.* at ——, 109 S.Ct. at 739 *passim* (Marshall, dissenting); *see also* Joint Statement, *Constitutional Scholars' Statement on Affirmative Action After City of Richmond v. J.A. Croson Co.*, 98 Yale L.J. 1711, 1712 (1989) [hereinafter *Constitutional Scholars' Statement*] ("On at least four noteworthy occasions ... the Supreme Court has made clear that affirmative action remedies, if carefully devised, can be entirely constitutional.").

■ The Richmond program did not include preferences for women-owned business enterprises ("WBE's"), so the *Croson* Court did not address such programs. The Ninth Circuit has held that WBE set-aside programs are subject to "mid-level review" —a standard less searching than "strict scrutiny." WBE programs must demonstrate "exceedingly persuasive justification" to survive mid-level review. *Associated Gen. Contractors v. City & County of San Francisco*, 813 F.2d 922, 939-40 (9th Cir.1987) ("*AGC*") (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982)), *petition for mandamus dismissed*, —— U.S. ——, 110 S.Ct. 296, 107 L.Ed.2d 276 (1989). Also, the means used to further the goal of remedying the effects of past discrimination against women must be "substantially related" to the achievement of that goal. *Id.* at 941.

## II.  DISCUSSION

■ Plaintiffs contend that King County's MBE set-aside program suffers from the same two defects found fatal to Richmond's program. They also argue that the WBE aspects of the program do not satisfy the standards set forth in *AGC*.

In *Croson*, virtually no evidence of past discrimination had been presented to support the rigid quota imposed by the Richmond set-aside program. The disparity in that case between the evidence of the harm and the breadth of the remedy has no parallel in the King County set-aside program. King County has evidence of greater weight, detail, and specificity to support the adoption of its more flexible MWBE set-aside program. Applying strict scrutiny to the MBE aspect of the program, the evidence supporting King County's program is sufficient under the *Croson* requirements, and the program is narrowly tailored. The WBE set-aside program survives the less intense scrutiny applied to gender-based programs.

### A.  *Basis in Evidence for King County's Program*

The *Croson* Court found that the Richmond City Council lacked the required "'strong basis in evidence for [the council's] conclusion that remedial action was necessary.'" *Croson*, 488 U.S. at ——, 109 S.Ct. at 724 (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986) (plurality opinion)). Although the Court did not specify the quantity of evidence that would be sufficient, it rejected Richmond's evidence as not "approaching a prima facie case of a

constitutional or statutory violation by *anyone* in the Richmond construction industry." *Id.* (emphasis in original).

The set-aside program at issue here is supported by a strong basis in evidence of past discrimination in the King County construction industry. Several dozen people gave written or oral descriptions of such discrimination. *See, e.g.,* Letter of Reginald S. Frye, Record at 230, 232–33; Affidavit of Dianne M. Strobel, Record at 430; Affidavit of Rigo Vela, Record at 468. Many of the sources relied upon by the County Council provided specific examples of past discrimination in the construction industry in King County.

The contrast between the evidence in *Croson* and that before the King County Council is striking. The *Croson* Court found: "There was no direct evidence of race discrimination on the part of the city in letting contracts or any evidence that the city's prime contractors had discriminated against minority-owned subcontractors." *Id.* 488 U.S. at ——, 109 S.Ct. at 714. The district court that approved the Richmond plan based its findings of past discrimination on several factors, including statements by a few proponents of the set-aside program that there had been discrimination in the construction industry, and reports of a significant disparity between the percentage of minorities receiving contracts from the city and the percentage of minorities in the city population. *See id.* at ——, 109 S.Ct. at 724. The detailed and specific descriptions of discrimination found in the King County record, on the other hand, are not the type of "generalized assertion[s]"

of past discrimination criticized by the *Croson* Court. *See id.* at ——, 109 S.Ct. at 723.[4]

Moreover, in *Croson* much of the evidence was found to be of "little probative value" because it did not apply specifically to discrimination in the *local* construction industry. *Id.* at ——, 109 S.Ct. at 714, 723–24. The Court thus found Richmond's evidence inadequate to identify past discrimination sufficiently to support the "rigid quota" prescribed by the set-aside program. *Id.* at ——, 109 S.Ct. at 727. In contrast, nearly all of King County's evidence applies specifically to the construction industry within the county's jurisdiction.[5]

■ Plaintiffs argue that the county inappropriately relied on evidence of discrimination in other jurisdictions, such as Pierce County, Seattle, and the Municipality of Metropolitan Seattle ("Metro"). The *Croson* Court did not bar the "sharing" of evidence among local jurisdictions with inclusive or common geographic borders. The Court merely held that evidence of discrimination in the *national* construction industry was not enough to support imposition of a *local* race-based remedy. *Id.* 488 U.S. at ——, 109 S.Ct. at 726–27. King County could properly consider evidence from Seattle, which is located within the county, and from Metro, whose borders are identical to those of the county.[6]

Plaintiffs also argue that the county may rely only on evidence of discrimination by the county, and not on evidence that merely

---

**4.** After this action was commenced, King County received a draft of a detailed report on past discrimination in the local construction industry. A copy of that report has been filed with the court. Plaintiffs contend that it should not be considered. The record contains sufficient evidence to support the county's program in the absence of the disputed report. The court has not considered the report in reaching its decision.

**5.** Plaintiffs argue that *Croson,* in citing *AGC* with approval, implicitly adopted a minimum standard for evidence of discrimination, i.e., evidence superior to that rejected by the *AGC* court. *See Croson,* 488 U.S. at ——, 109 S.Ct. at 719, 725. They assert that King County's evi-

dence is not as detailed or specific as that rejected as inadequate in *AGC. See* 813 F.2d at 931–34. However, the citations to *AGC* in *Croson* were used to support other conclusions. Those citations do not adopt any evidentiary standards that might be inferred from *AGC.*

**6.** Some of the present record refers to evidence of discrimination outside King County and/or the construction industry. *E.g.,* Transcript, Pierce County Council Fiscal Management Comm., Record at 119. Even when all such evidence is disregarded, however, the remaining evidence is fully sufficient to support the county's finding of past discrimination in the King County construction industry.

shows past discrimination in the local private construction industry. *See AGC*, 813 F.2d at 931–32 (lack of evidence of past discrimination by city officials was the disputed ordinance's "most significant shortcoming"). This holding in *AGC* has been effectively overruled by *Croson*. The plurality found:

> [I]f the city could show that it had essentially become a "passive participant" in a system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city could take affirmative steps to dismantle such a system. It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice.

*Croson*, 488 U.S. at ——, 109 S.Ct. at 720. King County's construction project dollars flowed through the local construction industry, making the county a "passive participant" in the discrimination described on the record.

A Supreme Court plurality opinion alone could not overturn the Ninth Circuit's holding in *AGC*. *See, e.g., Powers v. Alabama Dep't of Educ.*, 854 F.2d 1285, 1292 n. 11 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989). However, six Justices support the plurality's opinion that a state government entity seeking to impose a race-based remedy need not obtain evidence of its own direct discrimination to justify that remedy. *Id.* 488 U.S. at ——, 109 S.Ct. at 717–20 (plurality opinion) (Justice O'Connor joined by two other Justices); *id.* at ——, 109 S.Ct. at 745–49 (Marshall, J., dissenting) (joined by two other Justices).[7] Where multiple opinions leave the Court's ultimate holding in some doubt, "a lower federal court must do its level best to extract the holding that commanded a majority ... to arrive at the governing principles and limitations." *Shurberg Broadcasting of Hartford, Inc.*

*v. FCC*, 876 F.2d 902, 910 (D.C.Cir.1989) (separate opinion of Silberman, J.). The opinions of these six Justices constitute the majority holding on this issue. *See Constitutional Scholars' Statement, supra*, at 1713; *cf. Winter Park Communications, Inc. v. FCC*, 873 F.2d 347, 354 (D.C.Cir. 1989) (relying on opinions in *Croson* of three Justices in plurality and three in dissent for continued vitality of *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)).

■ The Supreme Court's post-*Croson* summary affirmance of a Sixth Circuit decision similar to *AGC* does not alter this holding in *Croson*. *See Michigan Road Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583, 595 (6th Cir.1987) (requiring showing of past government discrimination), *aff'd without opinion*, —— U.S. ——, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989). A summary affirmance by the Supreme Court affirms only the judgment of the lower court, not necessarily that court's reasoning. *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977). Summary actions by the Supreme Court are not to be read as "a renunciation by [the] Court of doctrines previously announced in [its] opinions after full argument," nor should they be understood "as breaking new ground." *Id.* at 176, 97 S.Ct. at 2240–41. The Court's holding in *Croson* remains undisturbed by its later affirmance of *Michigan Road Builders*.

The record contains ample evidence of past discrimination against women in the local construction industry. *See, e.g.,* Affidavit of Cindy M. Strouss, Record at 605, 605–07; Affidavit of Anne C. Symonds, Record at 673–694. This evidence provides the "exceedingly persuasive justification" required to support the gender-based remedy imposed by the county's WBE set-aside program, *see AGC*, 813 F.2d at 939–40, and identifies the past discrimination clearly

---

7. Justice Kennedy also seems to have agreed with this opinion. *See Croson*, 488 U.S. at ——, 109 S.Ct. at 735 (Kennedy, J., concurring) (among matters left unexamined by Richmond City Council was "extent to which the City con-

tributed to [past discrimination], either by intentional acts *or by passive complicity in acts of discrimination by the private sector* ") (emphasis added).

enough to assure that the remedy will be normal.

## B. *Narrow Tailoring of the Remedy*

The strict scrutiny standard requires that race-based measures "fit" the compelling goal which justifies their use. *Id.* 488 U.S. at ——, 109 S.Ct. at 721 (plurality opinion). Under the less stringent mid-level scrutiny, gender based remedies must be "substantially related" to the goal of eliminating the effects of gender discrimination. *AGC*, 813 F.2d at 941.

The *Croson* Court found that the Richmond MBE program suffered two defects that made it unconstitutionally broad. First, the city did not appear to have considered the use of race-neutral means to increase minority business participation in city contracting. *Croson*, 488 U.S. at ——, 109 S.Ct. at 728. The Court noted:

Many of the barriers to minority participation in the construction industry relied upon by the city to justify a racial classification appear to be race neutral. If MBEs disproportionately lack capital or cannot meet bonding requirements, a race-neutral program of city financing for small firms would, *a fortiori*, lead to a greater minority participation. The principal opinion in *Fullilove* found that Congress had carefully examined and rejected race-neutral alternatives before enacting the MBE set-aside. There is no evidence in this record that the Richmond City Council has considered any alternatives to a race-based quota.

*Id.*

King County's MWBE program does not suffer from this defect. The county considered the race-neutral alternatives suggested in *Croson*. King County, Wash., Code § 4.18.005(E) (finding that "no effective [race-neutral] alternatives appear to be presently available"). Those alternatives were rejected because state law bars the county from implementing them. *See In re Marriage of Johnson*, 96 Wash.2d 255, 261–68, 634 P.2d 877 (1981) (state constitution prohibits gifts or loans of public funds to private entities) (citing Wash. Const. Art.

VIII, § 5); RCW ch. 39.08 (state statute restricting county bonding procedures).

Plaintiffs argue that several race-neutral alternatives could have been but were not considered by the county. However, the deposition of Terry Koyano, cited by plaintiffs in support of this argument, shows that the county did consider many of the alternatives plaintiffs suggest. Koyano Deposition at 27–36. *Croson* does not compel the county to consider every imaginable race-neutral alternative, nor to try alternatives that would be plainly ineffective. The record establishes that King County carefully considered race-neutral alternatives before implementing its race-based remedy.

The second defect cited in *Croson* was the Richmond program's "rigid numerical quota." *See infra.* The Court held:

[T]he 30% quota cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing. It rests upon the completely unrealistic assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population.

*Croson*, 488 U.S. at ——, 109 S.Ct. at 728. The Court was concerned that the Richmond program was not tied to the local availability of MBE's, but instead to the number of minorities in the local population. *Id.*

The King County program is not a rigid quota system. Two methods may be used to provide benefits to MWBE's. The percentage preference method used to award the contract at issue in this case is far less burdensome to non-MWBE's than the quota imposed by Richmond. The King County program includes several measures to conform the remedy provided to the identified discrimination. For example, MWBE utilization requirements are tied to the availability of qualified MWBE contractors, not to the percentage of minorities or women in the population in general. King County, Wash., Code § 4.18.060(B). The county may waive or reduce the MWBE preferences if qualified MWBE's are not available, or if a bidding MWBE's higher price is not attributable to the effect of past discrimination. *Id.* § 4.18.070(A)(5).

These provisions prevent the county's MWBE program from extending benefits not related to past discrimination. *See Croson*, 488 U.S. at ——, 109 S.Ct. at 728–29 (noting similar waiver provisions in federal set-aside program approved in *Fullilove*).

The Richmond MBE program potentially provided benefits to groups not subjected to past discrimination. *Id.* at ——, 109 S.Ct. at 728. The Court criticized this over-inclusion that resulted from the program's rigidity: "Under Richmond's scheme, a successful [minority] entrepreneur from anywhere in the country enjoys an absolute preference over other citizens based solely on their race." *Id.* at ——, 109 S.Ct. at 729. King County avoids this pitfall by allowing denial of MWBE program benefits in particular contracts or categories of contracts if the group in question has not been discriminated against. King County, Wash., Code § 4.18.010(S), –(HH).

The MWBE program at issue here is narrowly tailored to remedy the effects of the past discrimination identified in the local construction industry. The county considered race-neutral alternatives, and adopted some of them, but still found evidence of ongoing effects of past discrimination. The remedy adopted is different in kind from the racial quota employed by Richmond, and avoids the overinclusiveness which led the Supreme Court to find that city's remedy unconstitutional.

### III. CONCLUSION

The Supreme Court has held that race-based government programs must remain a last resort in attempts to remedy the effects of past discrimination. The *Croson* holding requires that such programs be based on sufficient evidence of past discrimination, and that they be limited to redressing actual discrimination. Local governments are also strictly limited in their use of gender-based programs. King County had enough evidence before it to prove the discrimination it sought to redress, and the remedy it has adopted is narrowly tailored to the need. The Coun-

ty's program is constitutional under both the *Croson* and the *AGC* standards.

Accordingly, plaintiffs' motion for summary judgment is denied, and defendant's motion for summary judgment is granted.