MIAMI TELE-COMMUNICATIONS, INC., Plaintiff,

v.

CITY OF MIAMI; Xavier Suarez, in his official capacity as Mayor of the City of Miami; Miller J. Dawkins, in his official capacity as Vice Mayor of the City of Miami; J.L. Plummer, Jr., Miriam Alonso and Victor De Yurre, in their official capacities as Commissioners of the City of Miami; Jorge L. Fernandez, in his official capacity as City Attorney for the City of Miami; and Cesar Odio, in his official capacity as City Manager of the City of Miami, Defendants.

No. 90–0517–CIV.

United States District Court, S.D. Florida, Miami Division.

July 19, 1990.

John T. Kolinski, Miami, Fla., for plaintiff.

Charles C. Mays, Miami, Fla., for defendants.

## FINAL JUDGMENT

RYSKAMP, District Judge.

This cause is before the court upon conclusion of a nonjury trial. After careful consideration of the parties' memoranda and the evidence and arguments presented at trial, the court concludes that the City of Miami's imposition of a penalty against the plaintiff is improper, and the plaintiff is entitled to a declaratory judgment and injunctive relief.

## I. BACKGROUND

In 1980, the Miami City Commission ["the city commission" or "the commission"] adopted Cable Television License Ordinance No. 9223 ["the enabling ordinance"] which set forth the general terms, provisions, and conditions pursuant to which the City of Miami ["the city"] would grant a cable television license to an approved licensee. After enactment of this ordinance, the city requested competitive bids for the award of the license, which it ultimately granted to the plaintiff Miami Tele–Communications, Inc. ["Miami TCI" or "the licensee" or "the cable company"]

and its joint venture partner, Americable of Greater Miami, Ltd. Pursuant to the terms of the enabling ordinance, the agreement reached between the city and the licensee was subsequently embodied as Ordinance No. 9332 ["the licensing ordinance" or "the ordinance"] and adopted by the commission in 1981. In 1987, Miami TCI purchased the interest of its joint venture partner, with the city's approval, and has been the sole operator of the cable television franchise since that time.

On December 7, 1989, a commission meeting was held, during which time certain questions and concerns were raised regarding Miami TCI's performance under the licensing ordinance. As a result of that meeting, key executives of Miami TCI who were not present were invited to appear before the commission at a later date to address these concerns. At a commission meeting held on January 11, 1990, executives from Miami TCI appeared before the commission and the matters raised at the previous meeting were discussed. Before the conclusion of that meeting, and without providing prior notice that the imposition of a penalty would be considered, the commission adopted Resolution No. 90–0028, which found Miami TCI in violation of the licensing ordinance and assessed a penalty of $2,500 per day against the cable company. Pursuant to the resolution, the penalty became effective immediately and was to continue until the city manager determined that Miami TCI was in compliance with the provisions that it had allegedly violated.

Thereafter, Miami TCI filed a multi-count complaint in this court seeking various forms of declaratory and injunctive relief from the imposition of the penalty.

## II. ANALYSIS

The issue before this court, simply stated, is whether the city's imposition of a penalty against Miami TCI was proper. In challenging the penalty, Miami TCI first asserts that the procedure by which it was assessed violated the fourteenth amendment's guarantee to due process of law. Miami TCI also challenges the constitutionality of sections 1104 and 1106 of the licensing ordinance, the provisions upon which the penalty was based,[1] by asserting that these provisions violate the equal protection clause of the fourteenth amendment and are unconstitutionally vague. Alternatively, Miami TCI asserts that the assessment of a penalty is violative of Florida contract law. Each of these arguments will be addressed in turn.

### The Due Process Claim

The fourteenth amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. It is well-settled that:

[p]rior to deprivation of life, liberty or property, due process requires that a governmental entity must provide a citizen adequate notice, *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), as well as ample opportunity to be heard at a meaningful time and in a meaningful manner appropriate to the nature of the case. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976); *Mullane v. Central Hanover Bank and Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950).

*Chicago Cable Communications v. Chicago Cable Com'n,* 879 F.2d 1540, 1545 (7th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 839, 107 L.Ed.2d 835 (1990).

Miami TCI maintains that because the city commission adopted Resolution No. 90–0028, which assessed a daily penalty of $2,500 without prior notice that the imposition of a penalty would be considered, and without a meaningful opportunity to be heard, the city failed to afford the due process of law required by the fourteenth

---

**1.** Initially, the penalty also was based on alleged violations of sections 608 and 709 of the licensing ordinance. Sections 608(b) and 709(b) require the cable company to maintain an office, on a twenty-four hour basis, for the purpose of receiving subscriber complaints and requests for services and to maintain a service and repair force capable of responding to subscriber complaints within twenty-four hours. At the time of trial, the city no longer asserted that Miami TCI was violating sections 608 and 709. Thus, the propriety of assessing a penalty based on alleged violations of those sections is not before this court.

**1576**

amendment. The city does not dispute the general proposition that it is required to provide due process before depriving a citizen of a property right. Nor does the city dispute that Miami TCI was not afforded due process before the penalty at issue was imposed. Instead, the city asserts that it was not required to provide Miami TCI with due process under the circumstances of this case because the cable company waived its right to be afforded due process when a penalty is assessed by the city commission.

■ Although the constitutional right to due process may be waived, the waiver of a constitutional right must be voluntary, knowing, and intelligent. *Fuentes v. Shevin,* 407 U.S. 67, 94–95, 92 S.Ct. 1983, 2001, 32 L.Ed.2d 556 (1972); *D.H. Overmyer Co. v. Frick,* 405 U.S. 174, 185, 92 S.Ct. 775, 782, 31 L.Ed.2d 124 (1972); *Erie Telecommunications, Inc. v. City of Erie,* 853 F.2d 1084, 1094 (3rd Cir.1988); and *Gonzalez v. County of Hidalgo,* 489 F.2d 1043, 1046 (5th Cir.1973).

■ Before considering the validity of a waiver, however, the court must make a threshold determination as to the *existence* of a waiver. *Fuentes,* 407 U.S. at 95, 92 S.Ct. at 2001, 32 L.Ed.2d 556. "We need not concern ourselves with the involuntariness or unintelligence of a waiver when the contractual language relied upon does not, on its face, even amount to a waiver." *Id.* "[A] waiver of constitutional rights in any context must, at the very *least,* be clear." *Id.* (emphasis in original). Thus, a waiver must be established by "clear" and "compelling" evidence, *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094 (1967); *Erie Telecommunications,* 853 F.2d at 1094, and courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Aetna Ins. Co. v. Kennedy,* 301 U.S. 389, 393, 57 S.Ct. 809, 811, 81 L.Ed. 1177 (1937).

■ To establish the existence of a waiver, the city first relies on the language of the licensing ordinance itself. The city asserts that the ordinance, which embodies the terms of the parties' agreement, established two separate and distinct mechanisms for assessing a penalty against the licensee, one of which required that due process be provided and one that did not. Thus, the city asserts that the language of the ordinance is consistent with an occurrence of waiver because the ordinance does not require that due process be afforded when a penalty is imposed by the city commission. Miami TCI maintains, however, that the ordinance does not support the city's waiver argument because nothing in the language of the ordinance indicates that the city commission is exempt from that section of the ordinance requiring the city to provide notice and an opportunity to be heard before imposing a penalty.

Construction of municipal ordinances is a question of law for the court. *See Clark v. Kreidt,* 145 Fla. 1, 199 So. 333 (1940); *City of Homestead v. Levy,* 444 So.2d 1074 (Fla. 3d DCA 1984). Thus, this court must construe the terms of the ordinance to determine whether the city commission is required to provide the licensee with due process of law prior to assessing a penalty.

A review of the relevant provisions of the licensing ordinance indicates that section 1001 requires the licensee to establish and maintain a security fund against which penalties may be exacted for the licensee's failure to comply with the ordinance. City of Miami, Fla., Cable Television License Ordinance No. 9332, 10–19–81, § 1001. Section 1002 delineates seven specific violations of the ordinance for which penalties are to be assessed against the licensee's security fund. *Id.* at § 1002. Section 1003 provides that in addition to the penalties set forth in section 1002, the city commission may impose a penalty not to exceed $2,500.00 per day for a willful and/or repeated violation of any provision of the ordinance. *Id.* at § 1003.

Although section 1003 empowers the city commission to assess penalties against the licensee, it does not set forth the procedure by which the commission may impose a penalty. Indeed, the only section of the ordinance addressing the procedure governing the imposition of penalties is found in section 1004.[2] That section, which is

**2.** In 1984, section 1004 of the licensing ordinance was amended by Ordinance No. 9915.

entitled "Procedure for assessing penalties" provides that:

> Penalties shall be assessed in accordance with the following procedure:
>
> (1) The city manager shall notify the licensee in writing of the alleged violation. The licensee shall be allowed not more than thirty (30) days, or such other amount of time as the city manager may specify, to correct such alleged violation or to present facts and argument in refutation of the alleged violation.
>
> (2) If the city manager then concludes that there is a basis for assessment of a penalty or penalties pursuant to sections 1002 and/or 1003 of this ordinance, he shall notify the licensee thereof, and shall file his written recommendation to the panel of arbitrators established hereunder.

*Id.* at § 1004.

It is clear from a reading of the ordinance that it empowered the city commission to assess penalties and that it attempted to establish a procedure that ensured that the licensee would be afforded adequate due process of law before a penalty was imposed. Notwithstanding, the city asserts that the procedure set forth in section 1004 does not govern the imposition of penalties assessed by the commission because section 1004 does not specifically state that it applies to the city commission.

■ Under the city's interpretation of the ordinance, section 1004 provides for the assessment of a penalty by a panel of arbitrators[3] after the licensee has been afforded notice and an opportunity to be heard. Section 1003, by contrast, provides for the assessment of a penalty by the city commission without affording the procedural safeguards of section 1004 or the guarantees of the due process clause. The court rejects the city's interpretation of the ordinance, however, and concludes that the procedure established in section 1004 governed the imposition of penalties regardless of whether those penalties were to be assessed by the arbitration panel, at the behest of the city manager, or by the city commission.

The ordinance contains neither an express waiver nor any other indication that Miami TCI waived its constitutional right to be afforded due process by the city commission. None of the language employed in section 1004, the only section addressing the assessment of penalties, indicates that the city commission is exempt from its purview. Instead, that section states in general terms, without differentiating between the city commission and the city manager, that "[p]enalties shall be assessed in accordance with the following procedure." *Id.* at § 1004. Similarly, the preamble to Ordinance No. 9915, which amended section 1004, explained that the amendment was adopted because "the Commission [wa]s desirous of establishing a better procedure for the determination and assessment of penalties by *the City* against the Licensee in order to assure fairness and due process."[4] Ordinance No. 9915 (emphasis added). Again, because the language employed refers to the assessment of penalties by "the city," without differentiating between penalties assessed by the city commission and those assessed at the instance of the city manager, this court is constrained to conclude that section 1004 applies with equal force to both. Any omission or ambiguity in

---

3. Although the ordinance states that the arbitrators will submit "a written report of their findings and recommendations to the City Commission," the ordinance makes clear that "[t]he finding of the arbitrators shall be *binding and final* unless the entire decision or any part thereof is *appealed* by the administration or the licensee *to the City Commission* ..." *Id.* at § 1004. (emphasis added). Thus, the arbitrators are responsible for the assessment of penalties, notwithstanding the fact that their decision is subject to appellate review by the commission.

The court notes that the city did not rely upon section 1004, as amended by Ordinance No.

9915, in imposing the penalty at issue. Thus, Miami TCI's due process arguments challenging that procedure are not ripe for review, and the court declines to determine the constitutionality of that procedure.

4. The preamble also should be consulted to determine the purpose of an ordinance or amendment. *See Lussier v. Dugger,* 904 F.2d 661 (11th Cir.1990); *Pappalardo v. Sugar Sands Condominium Association,* 528 So.2d 992 (Fla. 4th DCA 1988).

drafting the ordinance must be construed against the city particularly in light of this court's duty to "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Aetna,* 301 U.S. at 393, 57 S.Ct. at 811, 81 L.Ed. 1177.

Therefore, based on the structure and language of the ordinance, the court concludes that it is by no means "clear" that Miami TCI waived its right to be afforded due process by the city commission because the "language relied upon does not, on its face, . . . amount to a waiver." *Fuentes,* 407 U.S. at 95, 92 S.Ct. at 2001, 32 L.Ed.2d 556. On the contrary, a reasonable construction of the ordinance indicates that the city intended to provide due process of law before imposing a penalty. Nothing in the language of the ordinance indicates that an exception was carved out for the imposition of penalties by the city commission.

■ Implicit in this conclusion is the court's determination that the ordinance is unambiguous insofar as it provided the licensee with notice and an opportunity to be heard prior to imposition of a penalty, including a penalty assessed by the city commission. Thus, the court need not consider testimony presented by the city at trial to establish the existence of a waiver by Miami TCI.

■ The court recognizes that if the ordinance were ambiguous as to whether it required the city commission to provide due process, then it was incumbent on the court to rely on the trial testimony to determine the existence of a waiver by Miami TCI. The court would also have to rely on the trial testimony to determine whether waiver occurred if the ordinance unambiguously indicated that the city commission was *not* required to provide the licensee with due process. In that instance, the city would bear the burden of proving that due process was not required, and therefore not provided for in the ordinance, because Miami TCI waived that right with respect to the city commission. Yet, even if the court relied on the trial testimony, and found that the city had proven the existence of a

waiver, that testimony was insufficient to establish that any waiver was valid because the city failed to show that the waiver was "voluntary, knowing and intelligent." *Erie Telecommunications,* 853 F.2d at 1094.

Although the city baldly asserts that the negotiations between Miami TCI and the city constituted an arms length transaction, the evidence supports Miami TCI's assertion that the agreement between the parties was akin to a contract of adhesion.[5] The city had the authority to grant a fifteen-year license that would essentially create a natural monopoly in the cable television industry, and the city had received proposals from five companies, all of whom satisfied the technical requirements for the grant of the license. Thus, notwithstanding the sophistication of a corporation like Miami TCI, the bargaining power of the parties was far from equal under the circumstances. Consequently, even if the city has established that while Miami TCI was negotiating for the grant of the license, it agreed to waive its right to due process, the city has not satisfied the heavy burden of proving the validity of that waiver because it failed to show that the waiver was made voluntarily, knowingly, and intelligently, as opposed to being a necessary condition to the grant of the license. *E.g., Fuentes,* 407 U.S. at 95, 92 S.Ct. at 2002, 32 L.Ed.2d 556; *cf. Overmyer,* 405 U.S. at 186, 92 S.Ct. at 782–783, 31 L.Ed.2d 124.

In conclusion, the language of the licensing ordinance required the city commission to provide the licensee with notice and an opportunity to be heard prior to the imposition of a penalty. Thus, contrary to the city's assertion, nothing in the language of the ordinance indicates that Miami TCI waived its right to be afforded due process by the commission. Furthermore, even if the court were to rely on the trial testimony to determine the existence of a waiver, the city failed to present evidence sufficient to establish the validity of the waiver. In the absence of clear and compelling evi-

---

**5.** The court acknowledges, as do the parties, that because the licensing ordinance embodied an agreement negotiated between Miami TCI and the city, the ordinance must be analyzed as

an ordinance for certain purposes and as an agreement or contract for other purposes, as in this instance.

dence that Miami TCI validly waived its right to be afforded due process by the city commission, the court is constrained to conclude that Resolution No. 90–0028, which was adopted without providing Miami TCI with adequate due process of law, must be declared unconstitutional and unenforceable.

### The Equal Protection Claim

■ The penalty assessed against Miami TCI was based in part[6] on alleged violations of sections 1104 and 1106 of the licensing ordinance. Section 1104 requires the licensee to establish an employment training program for city residents, particularly minority youth, and section 1106 requires the licensee to employ minority business enterprises ["MBEs"] for twenty percent of its contracted expenditures.[7]

Miami TCI contends that even if it had been afforded due process of law, the imposition of the penalty was nevertheless improper because sections 1104 and 1106 of the licensing ordinance violate the equal protection clause of the fourteenth amendment. In support of this contention, Miami TCI relies on City of Richmond v. J.A. Croson, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), in which the Supreme Court held a racially based set-aside program unconstitutional under the equal protection clause.

In Croson, the city council of Richmond, Virginia, adopted a plan requiring non-minority contractors that were awarded construction contracts by the city to subcontract at least 30 percent of the contract to a minority business enterprise. Id. at —— — ——, 109 S.Ct. at 712–713, 102 L.Ed.2d 854. The city subsequently issued an invitation to bid on a particular project, and Croson, a non-minority owned prime contractor, received the bid forms and attempted to contract with MBEs. Id. at ——, 109 S.Ct. at 715, 102 L.Ed.2d 854. Because Croson encountered difficulty contracting with an MBE, it could not comply with the MBE provision and applied for a waiver of its requirements. Id. The city denied Croson's request for a waiver and elected to rebid the project. Id. at —— — ——, 109 S.Ct. at 715–716, 102 L.Ed.2d 854. Croson then brought suit under 42 U.S.C. § 1983 challenging the constitutionality of the set-aside provision. Id. at ——, 109 S.Ct. at 716, 102 L.Ed.2d 854.

In considering the constitutionality of the provision, a majority of the Court observed that "[w]hile there is no doubt that the sorry history of both private and public discrimination in this country has contribut-

---

**6.** See note 1, supra.

**7.** Section 1104 is entitled "Employment training programs" and provides in pertinent part:

(a) The licensee shall, during the entire term of the license, conduct a job skills and training program to train city residents, particularly unskilled and semiskilled minority youth, for employment in the cable industry and the licensee. At a minimum, the training program shall include the following programs or their equivalents:

(1) A cable job training center;

(2) Employee on-the-job training courses funded on a continuing basis;

(3) An internship program for Miami students, with a minimum of ten (10) internships annually in the clerical, technical and management job classifications; and

(4) A management training program in all facets of cable system management.

The participants in the training programs shall be representative of the racial and ethnic composition of the city.

Section 1106 is entitled "Minority business enterprise participation policy" and provides in pertinent part:

(a) The licensee shall make reasonable and good-faith efforts to procure from or use, on an annual basis during the term of this license, qualified minority business enterprises, as defined below, for twenty (20) percent of the total dollar amount of any and all contracted expenditures by the licensee, including without limitation contracts for the acquisition of goods, services, materials, supplies and equipment used in the construction, maintenance and operation of the system, but excluding factory direct purchase terms or items purchased from a sole source of supply. A "minority business enterprise" shall mean a business at least fifty-one (51) percent of which is owned by minorities or, in the case of a publicly owned business, at least fifty-one (51) percent of the stock of which is owned by minorities and whose management and daily business operations are controlled by one (1) or more such individuals.

It is presumed that the twenty (20) percent figure shall be allocated equally among minority business enterprises whose ownership or management is black and among those whose ownership or management is Hispanic.

ed to a lack of opportunities for black entrepreneurs, this observation, standing alone, cannot justify a rigid racial quota in the awarding of public contracts in Richmond, Virginia." *Id.* at ——, 109 S.Ct. at 724, 102 L.Ed.2d 854. The Court then held that the city's set-aside program violated the equal protection clause of the fourteenth amendment because the city failed to make a specific finding of identified discrimination in the construction industry and the program was not narrowly tailored to meet a compelling state interest of remedying the effects of past discrimination. *Id.* at —— – ——, 109 S.Ct. at 723–29, 102 L.Ed.2d 854.

 Because sections 1104 and 1106 of the ordinance at issue in this case also establish race-based set-asides [8] without a prior specific finding of identified discrimination, those sections must be declared unconstitutional based on the standard enunciated in *Croson*.[9] Notwithstanding this fact, the city asserts that *Croson* is inapplicable to this case because unlike the plaintiff in *Croson*, Miami TCI negotiated for, and agreed to include in the ordinance, the very provisions it now seeks to invalidate. Consequently, the city contends that Miami TCI waived its right to challenge these provisions and should be estopped from asserting their unconstitutionality.[10] Additionally, the city points out that Miami TCI

has already received a benefit from the ordinance because it has enjoyed a natural monopoly of a cable television franchise for several years. Therefore, the city relies on *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), for the proposition that the court should not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits.

Despite the city's arguments, the court concludes that under the circumstances of this case Miami TCI should not be precluded from asserting the unconstitutionality of sections 1104 and 1106. As Miami TCI points out, the provisions at issue were adopted before the decision in *Croson*. Thus, Miami TCI's agreement to include these provisions in the ordinance, at a time when such provisions were legal, does not constitute a waiver of its right to raise a subsequent challenge to those provisions. At the time of the agreement, Miami TCI could not waive a right that it did not have. This fact also supports the conclusion that it would be inequitable to estop Miami TCI from asserting its constitutional right at this time, even though it has received a benefit from the ordinance.

 While nothing estops Miami TCI from challenging the constitutionality of

---

**8.** In section 1106, the exact amount of the set-aside, i.e., twenty percent, is explicitly stated. In section 1104, the number of positions that must be set aside for minority participants is to be determined based on "the racial and ethnic composition of the city." Therefore, the amount of the set-aside in section 1104 is implicitly stated.

**9.** The predecessor cases to *Croson* are also instructive. *See generally Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

**10.** At times the city has referred to the estoppel argument as one involving "standing." It appears the city's use of this terminology is simply misplaced. Furthermore, the court points out that the city cannot successfully assert that Miami TCI lacks standing to challenge sections 1104 and 1106 of the licensing ordinance. Admitted-

ly, plaintiffs in the construction industry found to have suffered an injury sufficient to confer standing to challenge a race-based set-aside have generally been non-minority contractors precluded from bidding on, or being awarded, a contract because of the contested provision. *E.g., Milwaukee County Pavers Ass'n v. Fiedler*, 707 F.Supp. 1016 (W.D.Wis.1989); *Coral Const. Co. v. King County*, 729 F.Supp. 734 (W.D.Wash. 1989); *Cone Corp. v. Hillsborough County*, 723 F.Supp. 669 (M.D.Fla.1979). Notwithstanding, Miami TCI alleges an injury sufficient to confer standing to challenge the constitutionality of sections 1104 and 1106. The undisputed allegation that Miami TCI is being penalized $2,500 per day for failure to comply with the allegedly unconstitutional provisions sufficiently alleges "(1) that [it] has personally suffered some actual of [sic] threatened injury; (2) fairly traceable to the allegedly unconstitutional ordinance; and (3) likely to be redressed by the requested relief." *Associated Gen. Contractors v. City of New Haven*, 130 F.R.D. 4, 7 (D.Conn.1990) (citing *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)).

sections 1104 and 1106 under *Croson*, a salient distinction between these two sections must be taken into consideration. Section 1106 establishes a race-based classification that is inextricably linked to the requirement that the licensee subcontract a certain percentage of its contracted expenditures. Thus, section 1106 must be declared unconstitutional in its entirety. However, this is not the case with the constitutionally infirm portion of section 1104 which establishes a race-based classification for determining who shall be permitted to participate in the training program. Although this section is unconstitutional, it may be severed from the remainder of the provision pursuant to section 1510 of the licensing ordinance.[11] No authority has been cited, nor any argument advanced, to suggest that Miami TCI cannot be required to comply with section 1104, insofar as it requires the licensee to establish a program to train unskilled and semiskilled youth for employment in the cable industry.[12]

In conclusion, under the circumstances of this case, the doctrine of estoppel cannot be applied to preclude Miami TCI from challenging the constitutionality of sections 1104 or 1106. Further, because there has been no showing that these provisions were adopted to remedy the effects of identified past discrimination in the cable television or construction industry, the provisions

11. Section 1510 is entitled "Severability" and provides that:
 If any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason held invalid or unconstitutional by any court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision, and, except as otherwise expressly provided herein, such holding shall not affect the validity of the remaining portions thereof. This section shall not be construed, however, to prevent the city from determining that any such provision constitutes a material provision to this ordinance and, in the city's discretion, terminating the license upon any such holding.

12. The assumption, of course, is that the training program will be conducted fairly and without bias. However, should Miami TCI discriminate in the selection process for participants or in the administration of the program, the victim of that discrimination would have a cause of action against the cable company.

cannot withstand constitutional scrutiny in light of the standard enunciated in *Croson*. Thus, although the city is to be commended for its attempt to ensure that minority enterprises would partake in the business opportunities generated by the grant of this license, section 1106 must be declared unconstitutional on the ground that it violates the equal protection clause of the fourteenth amendment. The same result obtains as to section 1104 at least with respect to that portion establishing a race-based classification for determining the participants in the training program. The remainder of section 1104, however, is both constitutional and enforceable.[13]

### III. CONCLUSION

Based on the foregoing, it is:

ORDERED and ADJUDGED that a declaratory judgment and injunctive relief is entered in favor of the plaintiff and against the defendants as follows:

(1) Judgment is hereby entered declaring Resolution No. 90–0028 unconstitutional because it was adopted without providing the due process of law required by the fourteenth amendment;

(2) Judgment is hereby entered declaring section 1106 of the licensing ordinance unconstitutional in its entirety because it violates the equal protection clause of the fourteenth amendment;

 Furthermore, the court notes that if the city complies with the criteria established by the Supreme Court in the line of cases beginning with *Bakke, supra,* and culminating with its decision in *Croson, supra,* it may be permissible for the city to amend section 1104 prospectively to achieve the goal it set out to accomplish in adopting this ordinance.

13. The court's ruling in this regard obviates the necessity of addressing Miami TCI's contention that sections 1104 and 1106 are unconstitutionally vague. The contested language in section 1104 has been severed from the ordinance and section 1106 has been declared unconstitutional in its entirety under the equal protection clause. Furthermore, because these sections have been declared unconstitutional, the city's imposition of a penalty based on alleged violations of those sections was improper, and the court need not consider Miami TCI's argument that the imposition of a "penalty" was improper under principles of Florida contract law.

(3) Judgment is hereby entered declaring section 1104 of the licensing ordinance unconstitutional, in part, as follows: In section 1104(a), the word "minority," and the sentence that provides that "[t]he participants in the training programs shall be representative of the racial and ethnic composition of the city," are stricken from the ordinance because they violate the equal protection clause of the fourteenth amendment. The remainder of section 1104 is declared constitutional and enforceable.

(4) The defendants are hereby enjoined from enforcing Resolution No. 90–0028, the portions of section 1104 that have been stricken by order of this court, and section 1106 of the licensing ordinance;

(5) The defendants are hereby ordered to return, with interest, any monies taken from Miami TCI's security fund or otherwise received from Miami TCI in payment of the penalty assessed pursuant to Resolution No. 90–0028. Such monies shall be returned to plaintiff on or before July 20, 1990;

(6) All other requests for declaratory and injunctive relief are DENIED.

DONE and ORDERED.