ASSOCIATED GENERAL CONTRAC-
TORS OF CALIFORNIA,
INC., Plaintiff,

v.

CITY AND COUNTY OF SAN
FRANCISCO, Defendant,

Coalition for Economic Equity, San Francisco Hispanic Chamber of Commerce, Asian, Inc., San Francisco Black Chamber of Commerce, Defendants-intervenors.

No. C89–4554 TEH.

United States District Court,
N.D. California.

Oct. 9, 1990.

Ronald A. Zumbrun, John H. Findley, Sharon L. Browne, Pacific Legal Foundation, Sacramento, Cal., James W. Polk, Associated Gen. Contractors of CA, Inc., West Sacramento, Cal., for plaintiff.

Eva Jefferson Patterson, San Francisco Lawyers, Committee for Urban Affairs, San Francisco, Cal., Robert L. Harris, Charles Houston Bar Assoc., Oakland, Cal., Judith E. Kurtz, Shayna I. Marshall, Equal Rights Advocates, San Francisco, Cal., William C. McNeill, III, Employment Law Center, San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER DENYING PRELIMINARY INJUNCTION

THELTON E. HENDERSON, District Judge.

This matter comes before the Court on plaintiff's motion for a preliminary injunction. Having given careful consideration to the parties' written and oral presentations, and having reviewed the extensive administrative record, the Court concludes that plaintiff has not satisfied the standard for imposing interim injunctive relief. The discussion below constitutes the Court's findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a).

### I.

### BACKGROUND

Once again, this Court is called upon to judge the constitutionality of San Francisco's efforts to improve the opportunities for minority entrepreneurs to participate in city contracting. This continuing endeavor began over ten years ago with the passage of legislation prohibiting city contractors from discriminating against their employees on the basis of, among other things, race or color, and requiring them to take steps to integrate their work force. SF Admin. Code Ch. 12B. The Human Rights Commission of San Francisco ("HRC") subsequently concluded that further steps were necessary and adopted regulations requiring city prime contractors to award a portion of their subcontracts to minority business enterprises. SF Admin.Code, Ch. 12B(9). Then in 1982, the San Francisco Board of Supervisors—responding to complaints that minority and women owned businesses were still finding it difficult to break into the ranks of the city's prime contractors—directed the HRC to conduct hearings into the matter, make findings, and propose remedial legislation, if warranted. This process ultimately led to adoption of the Minority/Women/Local Business Utilization Ordinance, 139–84

("1984 Ordinance") in April of 1984. SF Admin.Code, Ch. 12(D).

This five year legislation required the city to set aside ten percent of its contracting dollars for minority-owned business enterprises ("MBEs") and two percent for women-owned business enterprises ("WBEs"). It also provided MBEs, WBEs and locally owned businesses ("LBEs") a five percent bidding preference to be taken into account when the city purchaser calculated the low bid. *Id.* at Ch. 12(D).8(B). To further encourage use of MBEs and WBEs, the legislation set an overall "goal" that 30 percent of city contract dollars would be earned by MBEs and ten percent by WBEs. *Id.* at Ch. 12D.3.

The 1984 Ordinance quickly drew a constitutional attack from the Associated General Contractors of California ("AGCC"), an organization whose members are primarily white, male contractors engaged in the building and construction industry.[1] The challenge was vindicated in part by the Ninth Circuit Court of Appeals, which found the remedies favoring women and locally owned businesses constitutionally sound but invalidated the race based provisions as offending the equal protection guarantees of the fourteenth amendment. *AGCC v. City and County of San Francisco*, 813 F.2d 922, 928–944 (9th Cir.1987) (hereafter *"AGCC–I"*). The Court also ruled that all three preferences violated San Francisco City Charter section 7.200, which required that contracts over $50,000 be let to the "lowest reliable and respon-

sible bidder." *Id.* at 927–928. This restriction, the Court found, compelled the city to award contracts based solely on the lowest bid, and without consideration of any other factors. *Id.* at 925–26. The city filed a petition for rehearing and suggestion for rehearing en banc, which stayed the Ninth Circuit's mandate. However, before any action was taken on the petition, the legislation expired in June of 1989, and the appeal was subsequently dismissed as moot.

Meanwhile, in January of 1989, a divided United States Supreme Court[2] struck down a similar ordinance that had been adopted by the city of Richmond, Virginia. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). However, in so doing, the Court confirmed that municipalities are empowered to employ race conscious remedies in the area of public contracting, if the remedy chosen is narrowly tailored to serve a compelling state interest. The *Croson* decision prompted the city of San Francisco to conduct additional hearings and commission statistical studies to determine whether a race conscious remedy would, in fact, serve a compelling state interest, as *Croson* required.[3] Concluding that it would, based on evidence of discrimination against MBEs by the city and private contractors, the city fashioned a remedy that it believed to be sufficiently "narrowly tailored" to pass constitutional muster. The result was the Minority/Women/Local Business Uti-

---

1. *See* Complaint at ¶ 3 ("A substantial number of AGCC's members desire to bid on public construction contracts to be let by defendant, but because they are not members of the race, sex, and local residence classes granted preference by defendant's policies and ordinance herein issue, said members are prevented ... from having their bids ... considered on the same basis ...").

2. Justice O'Connor announced the judgment of the Court; however, a majority of the justices joined only in parts I, III–B, and IV of her opinion. Chief Justice Rehnquist and Justice White joined in the entire opinion; Justice Stevens joined parts I, III–B and IV; Justice Kennedy joined in all but part II, and Justice Scalia concurred in the judgment. Justices Blackmun, Brennan, and Marshall dissented.

3. Prior to the issuance of *Croson*, the Human Rights Commission, in June and July of 1988,

heard testimony from 42 witnesses and received written submittals from 127 minority, women, local, and other business representatives. It also received testimonial and statistical evidence presented by city departments and HRC staff. Subsequent to *Croson*, ten additional public hearings were conducted, and additional written testimony was received. The San Francisco Board of Supervisors also requested that the city's Budget Analyst study the participation of minority and women owned businesses in city contracts at the prime contractor level for the fiscal year 1987–88, and compare that participation to minority and women businesses' share of their relevant respective industries or professions. The HRC also commissioned BPA Economics, Inc. to perform a statistical analysis of the data provided by city departments and the Budget Analyst. SF Admin. Code, Ch. 12D.2.

lization Ordinance—II, No. 175–89, unanimously passed by the Board of Supervisors on May 22, 1989,[4] and signed into law one week later by the Mayor. SF Admin.Code, Ch. 12D (hereafter the "1989 Ordinance").

Substantially reduced in scope from its predecessor, and based on a stronger factual predicate, the 1989 Ordinance does not set aside *any* amount of city contract dollars for minority or women owned enterprises.[5] Rather, its remedial focus is "bid preferences" for prime contractors; preferences which, the city asserts, are designed to provide M/W/LBEs with a "competitive plus" to compensate for past discriminatory practices. Specifically, it provides a five percent bid preference for LBEs and a ten percent bid preference for local MBEs and WBEs—the latter representing a 5 percent locality preference plus a 5 percent preference based on MBE or WBE status. SF Admin.Code Ch. 12D.8(B)(2).[6] The 1989 Ordinance also allows persons to benefit from preferences who would not otherwise qualify by joint venturing with an M/WBE. Thus, a non M/WBE that joint ventures with a local M/WBE, whose participation is between 35 and 51 percent, benefits from a five percent bid preference. Where the local M/WBE's participation is 51 percent or more, the preference increases to ten percent. *Id.*

In November 1989, the San Francisco Board of Supervisors also amended (per Ordinance No. 424–89) section 7.200 of the city charter. The amendment increased the dollar threshold for applying the "lowest reliable and responsible bidder" requirement from $50,000 to 10 million dollars. As a result, the city's charter only requires acceptance of the lowest bid in contracts involving more than 10 million

dollars.[7] *See* Plaintiff's Memorandum in Support of TRO, Exh. 1. Absent this amendment, even a new MBE ordinance that could withstand constitutional scrutiny under *Croson* would have little practical impact, for it would apply only to contracts under $50,000, in light of the Ninth Circuit's decision in *AGCC–I.*

On December 18, 1989, the Associated General Contractors of California filed the instant action which is a facial constitutional challenge to the MBE provisions of the 1989 Ordinance, insofar as they pertain to public works construction contracts.[8] The action also contends that the legislation raising the $50,000 threshold to ten million, with respect to the city Charter bidding provision, is invalid under state law. By this motion, brought pursuant to Fed.R. Civ.P. 65, plaintiff seeks to preliminarily enjoin San Francisco from enforcing the bidding preferences to the extent plaintiff contends they are unconstitutional or invalid under state law.

"District courts have broad discretion to grant or deny preliminary injunctive relief." *Squaxin Island Tribe v. State of Washington,* 781 F.2d 715, 724 (9th Cir. 1986); 11 Wright and Miller, Federal Practice and Procedure, § 2948 at 427. However, to guide this discretion, the Ninth Circuit has devised a test which requires the balancing of the merits of the case against competing equitable considerations. Thus, the moving party must demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. These formulations "are not different tests but represent two points on a sliding scale in which the de-

---

**4.** Two of the eleven members of the Board of Supervisors were absent at the final vote on May 22, 1990; however, they had previously voted in favor of the legislation at its "second reading" the week before.

**5.** City departments are instructed to make "good faith efforts" to reach certain participation goals, but no specific result need be attained. SF Admin Code, Ch. 12D.8(A)(1).

**6.** The Director of the San Francisco Human Rights Commission must certify businesses as bona fide M/W/LBEs through appropriately

promulgated procedures. SF Admin. Code Ch. 12D.6(B)(1).

**7.** In November of 1988, the electorate had amended section 7.200 to authorize the Board of Supervisors to increase or decrease by ordinance the threshold figure.

**8.** The action does not attack the constitutionality of race conscious provisions of the ordinance that relate to purchase or service contracts. Nor does the complaint challenge the constitutionality of the preferences favoring WBEs and LBEs.

gree of irreparable harm increases as the probability of success on the merits decreases." *Big Country Foods, Inc. v. Bd. of Educ. of the Anchorage School Dist.*, 868 F.2d 1085, 1088 (9th Cir.1989). However, under either formulation, the moving party "must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury." *Id.*

## II.

### EQUITABLE CONSIDERATIONS

Should members of AGCC fail to win a city contract due to the allegedly invalid preferences, plaintiff does not seriously dispute that any lost profits could not be remedied by a money judgment. In addition, at argument, plaintiff conceded that no AGCC member was currently asserting denial of a contract due to the MBE provisions.[9] Plaintiff also asserts that members are deterred from bidding because of the five percent MBE bidding preference. However, only one member of plaintiff has come forward with such a complaint. *See* Hodgson Decl.

Given the above, plaintiff's *pecuniary* interest can be adequately protected by available legal remedies, and thus does not warrant a mandatory injunction pending trial. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959) ("The basis of injunctive relief in the federal courts has always been

irreparable harm and inadequacy of legal remedies"); *State of California v. Tahoe Regional Planning Agency*, 766 F.2d 1316, 1319 (9th Cir.1985) (financial injury does not constitute irreparable harm where legal relief is available); *Bangor Baptist Church v. State of Maine*, 576 F.Supp. 1299, 1324 (D.Me.1983); 11 Wright & Miller, *supra*, § 2944 at 392. Nor can we say, given the 1989 Ordinance's limited impact on plaintiff's members, the city's strong interest in remedying its discriminatory practices, and the interests of affected MBEs, that the balance of hardships "tips sharply" in plaintiff's favor. *Big Country*, 868 F.2d at 1088.

■ That constitutional rights are at issue, however, raises the specter of irreparable injury. "Constitutional rights are so basic to our society that their deprivation must be redressable by equitable remedies. Injury from their deprivation is almost by definition irreparable." *Gour v. Morse*, 652 F.Supp. 1166, 1173 (D.Vt.1987). Thus, while plaintiff's financial interest does not establish a "significant threat" of irreparable injury, justifying equitable intervention, its constitutional claim does, to the extent it is meritorious. Accordingly, satisfying the equitable prong of the preliminary injunction test turns, in this particular case, on the viability of plaintiff's constitutional claim.[10] It is to that claim that we now turn.

---

**9.** The city's statistics indicate that for the first six months the 1989 Ordinance was in effect, 92.7 percent of the city's prime construction contract dollars awarded to San Francisco firms went to non-MBEs, while only 7.3 percent went to certified *and* non-certified MBEs. Thus, it is apparent that AGCC members are competing for and winning the vast majority of construction contracts. Rosales Decl. at ¶ 2 and Exh. G.

**10.** Although courts have stated that "when an alleged deprivation of a constitutional right is involved ... no further showing of irreparable injury is necessary," *see e.g., Sharif by Salahuddin v. New York State Educ. Dep't*, 709 F.Supp. 345, 359–60 (S.D.N.Y.1989) preliminary injunctive relief is generally only granted where the plaintiff has also demonstrated a likelihood of success on the merits. *See e.g., Sharif*, 709 F.Supp. at 364 (plaintiffs demonstrated likelihood of success on merits); *Doe v. Mundy*, 514 F.2d 1179, 1183 (7th Cir.1975) (plaintiffs showed probable success on merits); *Amalgamated*

*Transit Union, Local 1277 v. Sunline Transit Agency*, 663 F.Supp. 1560, 1564 (C.D.Cal 1987) (court finds plaintiff "will prevail on the merits" of fourth amendment claim); *Moynihan v. Hickey*, 627 F.Supp. 466, 475 (D.N.H.1986) (likelihood of success on merits shown); *Greater Baltimore Bd. of Realtors v. Hughes*, 596 F.Supp. 906, 924 (D.Md 1984) ("In light of its finding that the plaintiffs have demonstrated likelihood of success on the merits of their first amendment argument ... [they] have met the irreparable injury prong"). Indeed, it is only upon a showing of a likelihood of success on the constitutional claim that the "significant threat" of irreparable injury arises.

Conversely, even assuming *arguendo* that plaintiff could demonstrate a probability of success on the merits of the (non constitutional) state law claims, injunctive relief would not be warranted given that the only resulting injury from those claims is purely pecuniary and compensable at law. Accordingly, the Court does not address the state law claims at this juncture.

## III.

## THE EQUAL PROTECTION CLAIM

Our constitution's guarantee of equal protection on the one hand, and our government's interest in redressing a history of pervasive racial discrimination on the other, have proven uneasy partners in this country's quest to eradicate the destructive effects of racial prejudice that have long stained our nation. For as governmental bodies at all levels have concluded,[11] deepseated discriminatory patterns are seldom reversed by mere mandates "not to discriminate." Rather, certain circumstances may require the force of a race conscious remedy to dislodge ingrained patterns and bring the promise of complete equality within the grasp of, if not this, at least future generations.

Acknowledging that redressing past discrimination may necessitate taking "race into account," *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280, 106 S.Ct. 1842, 1850, 90 L.Ed.2d 260 (1986),[12] the Supreme Court has concluded more than once that the constitutional right to equal protection and race conscious remedies can coexist under appropriate, if limited, circumstances. *See, Metro Broadcasting, Inc. v. Federal Communications Comm'n*, —— U.S. ——, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (upholding racial preference with respect to FCC licensing and distress sale policies); *Croson*, 488 U.S. at 509, 109 S.Ct. at 729 (invalidating racial quota for subcontractors but leaving room for race conscious remedies where circumstances warrant); *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57

L.Ed.2d 750 (1978) (allowing considerations of race in admissions decisions); *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (upholding minority set aside for federal contracts); *United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (finding that race based promotional quota survives strict scrutiny); *see also, Cone Corp. v. Hillsborough County*, 908 F.2d 908, 913 (11th Cir.1990) (Under *Croson*, municipalities may enact race conscious legislation in some circumstances); Joint Statement, *Constitutional Scholars' Statement on Affirmative Action After City of Richmond v. J.A. Croson Co.*, 98 Yale L.J. 1711, 1712 (1989).

With respect to local governments, however, those circumstances are narrowly prescribed. Lacking the full powers bestowed on Congress under section 5 of the fourteenth amendment, municipalities may utilize racial classifications only to serve a compelling state interest, and then the method chosen must be narrowly tailored to serve that interest. *Croson*, 488 U.S. at 490–91, 493–94, 109 S.Ct. at 719, 721–22; *Wygant*, 476 U.S. at 273–74, 106 S.Ct. at 1846–47. This searching level of judicial inquiry is necessary to ensure that a tool as highly suspect as a racial classification is actually being used for legitimate purposes and not for "illegitimate notions of racial inferiority or simple racial politics." *Croson*, 488 U.S. at 493, 109 S.Ct. at 721. This test also "ensures that the means chosen 'fit' [the state's] compelling goal so closely that there is little or no possibility that the

**11.** *See e.g., Fullilove, infra,* (federally sponsored MBE program); *Ohio Contractors Ass'n v. Keip,* 713 F.2d 167 (6th Cir.1983) (state sponsored MBE program); *South Florida Chapter, Associated General Contractors of America, Inc. v. Metropolitan Dade County,* 723 F.2d 846 (11th Cir. 1984), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984); *Coral Constr. Co. v. King County,* 729 F.Supp. 734, 735 (W.D.Wash.1989) (appeal pending) (county sponsored MBE programs), *Contractors Ass'n v. City of Philadelphia,* 735 F.Supp. 1274 (E.D.PA.1990) (city sponsored MBE program); *see also, Scholars' Reply to Professor Fried,* 99 Yale Law Journal 163, 166 (1989) ("Affirmative action programs have been approved, time and again, by the American people acting through the democratic branches of

government—and at the national, state, and local level").

**12.** *See also, Regents of the University of California v. Bakke,* 438 U.S. 265, 407, 98 S.Ct. 2733, 2807, 57 L.Ed.2d 750 ("I suspect that it would be impossible to arrange an affirmative-action program in a racially neutral way and have it successful. To ask that this be so is to demand the impossible. In order to get beyond racism, we must first take account of race. There is no other way. And in order to treat some persons equally, we must treat them differently. We cannot—we dare not—let the Equal Protection Clause perpetuate racial supremacy") (Blackmun, J., separate opinion).

motive for the classification was illegitimate racial prejudice or stereotype." *Id.*

While the level of scrutiny demanded is clearly exacting, it is not beyond satisfaction. "Nothing we say today," the Court explained, "precludes a state or local entity from taking action to rectify the effects of identified discrimination within its jurisdiction.... In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion." *Croson*, 488 U.S. at 509, 109 S.Ct. at 729; *see also id.* at 505, 109 S.Ct. at 727 (*absent* evidence of "identified discrimination" the city of Richmond could not "demonstrate a compelling interest in apportioning public contracting opportunities on the basis of race") (emph. added).[13]

Plaintiff contends that the 1989 ordinance, properly scrutinized, does not serve a compelling state interest, and even if it does, it is not narrowly tailored. The city, on the other hand, asserts that the testimonial and documentary evidence amply demonstrates that the purpose of the 1989 ordinance was, in fact, to redress past discrimination against MBEs, and that the five percent MBE bid preference is a modest remedy, narrowly tailored to achieve that goal.

### A. Compelling interest

▮ While general societal discrimination, "without more, is too amorphous a basis for imposing a racially classified remedy," *Wygant*, 476 U.S. 267, 276, 106 S.Ct. at 1848, remedying the effects of discriminatory practices is a compelling governmental interest. *Croson*, 488 U.S. at 492, 109 S.Ct. at 720; *Paradise*, 480 U.S. at 167, 107 S.Ct. at 1065 ("The government unquestionably has a compelling interest in remedying past and present discrimination by a state actor"); *Coral Constr. Co. v. King County*, 729 F.Supp. at 735.

▮ However, local governments can not insulate race conscious remedies from attack simply by claiming a remedial motive.

Because "[r]acial classifications are suspect ... simple legislative assurances of good intention cannot suffice." *Croson*, 488 U.S. at 500, 109 S.Ct. at 724. Rather, the city must convince the court that its proffered purpose is genuine, a burden which can be met by supplying evidence of "identified discrimination" within the city's jurisdiction warranting remedial action. *Id.*, 488 U.S. at 505, 109 S.Ct. at 727; *cf., Wygant*, 476 U.S. at 277, 106 S.Ct. at 1848 (before school board embarks on an affirmative-action program, it must have "convincing evidence" that remedial action is warranted).

This is not a requirement, however, that a local public employer "convinc[e] the court of its liability for prior unlawful discrimination; nor does it mean that the court must make an actual finding of prior discrimination based on the employer's proof before the employer's affirmative action plan will be upheld," *Wygant*, 476 U.S. at 292, 106 S.Ct. at 1856 (O'Connor, J., concurring); *Chicago Fire Fighters v. Washington*, 736 F.Supp. 923, 926 (N.D.Ill. 1990). Rather, the critical point is that the "public actor has a firm basis for believing that affirmative action is warranted." *Wygant*, 476 U.S. at 292, 106 S.Ct. at 1856 (O'Connor, J., concurring); *Michigan Road Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583, 590–594 (6th Cir.1987), *aff'd summarily*, 489 U.S. 1061, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989) (reliance on societal discrimination failed to provide "firm basis" for state's remedial plan). Or as Justice O'Connor most recently stated in the context of public contracting, cities must have a " 'strong basis in evidence,' for [their] conclusion that remedial action [is] necessary." *Croson*, 488 U.S. at 500, 109 S.Ct. at 724.

*Croson* declines to detail exactly what kind of evidentiary showing will suffice, focusing instead on the inadequacy of the record underpinning the Richmond city program. However, we conclude that the evidentiary basis for the 1989 Ordinance is

---

13. *See also id.* 488 U.S. at 497, 109 S.Ct. at 723 (Noting that in *Wygant*, "Justice Powell, writing for the plurality, again drew the distinction between 'societal discrimination' which is an inad-

equate basis for race-conscious classifications, and the **type of identified discrimination that can support and define the scope of race-based relief**") (emph. added).

"strong" and in stark contrast to the record relied on by the city of Richmond.

Richmond had primarily relied on (1) the ordinance's declaration that it was remedial, (2) statements by proponents concerning discrimination in the construction industry in general, (3) statistical disparities between the number of minority businesses receiving prime contracts and the number of minorities in the general city population,[14] and (4) the dearth of minority contractors in local and state contractors associations. *Croson*, 488 U.S. at 499, 109 S.Ct. at 723–24.

Here, San Francisco has done far more than declare a benevolent purpose and point to generalized discrimination in the construction industry and statistics with little probative value. Rather, it has "identified discrimination" against MBEs in San Francisco by both the city and private contractors. Particularly significant is the statistical analysis prepared by BPA, Economics, Inc. Using the city and county of San Francisco as the "relevant market," [15] the study compared the number of available MBE prime construction contractors in San Francisco with the amount of contract dollars awarded by the city to San Francisco based MBEs for the 1987–1988 fiscal year. *See* "Statistical Support for San Francisco's MBE/WBE/LBE Ordinance," Legislative File 284–88–2 M, at 1–2.[16]

The study found that with respect to prime construction contracting, the disparities between the number of available Asian, Black, and Hispanic owned locally based firms and the number of contracts awarded to such firms was statistically significant, not attributable to chance, and supported an inference of discrimination. *Id.* at 18–20. Specifically, the study found that Asian construction contractors had a 23.6 percent availability, but received only 4.3 percent of prime construction contract dollars. The analogous figures for Black construction contractors were 13.3 percent and 2.2 percent, and for Hispanics, 11 percent and 3.4 percent. *Id.* at Table 1.[17]

---

14. In *AGCC–I*, San Francisco was also criticized for relying on an over inclusive statistical comparison—between the amount of prime contracts awarded MBEs in 1982–82 (2.8 percent) and the percentage of minority businesses in the city as a whole (33 percent). This latter figure lacked probative value, the court held, because it included various types of business that did not normally provide goods or services that were "subject to significant contracting by the city." 813 F.2d at 933.

15. Plaintiff's criticism that the city improperly designated the "relevant market" is misplaced. First, the 1989 ordinance is directed at remedying past discrimination against *San Francisco based* MBEs (only local MBEs qualify for a bid preference). Accordingly, any statistical analysis must correspond to this specific group. *Croson*, 488 U.S. at 501, 504, 109 S.Ct. at 725, 727); *Coral Constr. Co.*, 729 F.Supp. at 737 (noting that, in contrast to the *Croson* case, "nearly all of King County's evidence applies specifically to the construction industry within the county's jurisdiction"). Notably, plaintiff offers no alternative "more relevant" market.

16. The statistical report explains the approach used as follows: "[In *Croson*, the] Court emphasized a particular type of statistical evidence, namely a ratio calculated as the percentage of contract dollars going to minority businesses divided by the percentage of available businesses which are minority. This ratio is referred to in this report as a *utilization index*. If the city is acting in a non-discriminatory fashion, it should be choosing contractors randomly from the distribution of all qualified available contractors for this category. Therefore, a value for the utilization ratio for a particular minority group that is significantly less than 1.0 ... provides prima facie evidence of discrimination against that minority group in city contracting practices.

The appropriate way of judging whether the minority utilization index for a particular contracting category is significantly less than 100 percent is through the use of sampling theory. Since it is unlikely that the city will give *precisely* the proportion of contract dollars to minorities as minorities represent in the available contracting pool, differences of the actual utilization ratios from the expected value of 100 percent must be judged using statistical tests of significance, which show whether particular patterns can reasonably be attributed to chance or indicate evidence of discrimination." Statistical Study at 1–2 (emph. in original).

17. These percentages translate into a statistical significance of –6.372 for Asians, –4.557 for Blacks, and –3.378 for Hispanics. Any number –2.0 or less (more negative) was considered statistically significant. *Id; see, Hazelwood School Distr. v. United States*, 433 U.S. 299, 308 n. 14, 97 S.Ct. 2736, 2742 n. 14, 53 L.Ed.2d 768 (1977) (standard deviation greater than two or three supports inference of discrimination); *Chicago Fire Fighters*, 736 F.Supp. at 930.

As *Croson* instructs, "[w]here there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform ... and the number of such contractors actually engaged by the locality ... an inference of discriminatory exclusion could arise." *Croson*, 488 U.S. at 509, 109 S.Ct. at 729;[18] *see also, Wygant*, 476 U.S. at 267, 294, 106 S.Ct. at 1857 (when the "availability of minorities in the relevant labor pool substantially exceed[s] those hired ... one may draw an inference of deliberate discrimination ..."). Here, the statistically significant disparities, based on appropriate comparisons, provide a reliable basis for inferring discriminatory conduct by the city of San Francisco against Asian, Black, and Hispanic construction companies seeking prime contracts with the city. *Croson*, 488 U.S. at 501, 109 S.Ct. at 725 (relevant statistical disparities alone may constitute prima facie proof of a pattern or practice of discrimination); *Chicago Fire Fighters*, 736 F.Supp. at 929–30 (statistically significant disparities provided strongest evidence of past discrimination by city).

In addition to statistics, the San Francisco Board of Supervisors was presented, over the course of several hearings, with written and oral testimony from many MBEs who complained that discriminatory practices kept them excluded from prime contracts with the city. *See*, Reporters Transcript of Hearings re Minority and Women Business Participation in City Contracting, Legislative File 284–88–2 L (hereafter "Hearings") and "Supporting Communications" Legislative File 284–88–2(G); *see also*, Legislative File, 422–88–2 D (October 1983 and 1988 HRC Reports entitled "Investigation into Minority and Women Business Participation in City Contracting [Comprehensive Edition]: Findings, Recommendations and Support Documentation"). While the record is too lengthy to summarize here, we mention some of the illustrative testimony.

A not uncommon complaint was that MBEs were denied prime contracts despite being the lowest bidder. In one instance, a Filipino owned construction materials company was the low bidder and was within the price guidelines on at least two bids, but was not awarded the contracts. *See e.g.*, Hearings, March 9, 1989 at 82–84. In another example, a MBE testified that a city purchaser refused to award a contract to him even though he was the low bidder and was qualified to perform the contract. Hearings, February 2, 1989 at 41.

In other cases, qualified MBE firms were told they were not qualified, but were awarded contracts when outside parties evaluated the proposals. In one example, a city staff member called a MBE bidder and told him that "your proposal is ridiculous because you're not qualified" in an effort to get the bidder to withdraw. In that case, the Human Rights Commission hired an independent consultant to review the proposals and the MBE won the contract on the merits. Hearings, March 9, 1989 at 38–39. A MBE geo-technical environmental consulting firm was denied a contract ostensibly because its references were weak. The Human Rights Commission intervened and outside evaluators were hired.[19] Again, the MBE won the contract upon independent review. *Id.* at 41–43.

Complaints of discrimination by city staff were also buttressed by the testimony of Zula Jones, Contract Compliance Liaison for the Port of San Francisco. She told the Board that, "[i]t is well known at the Port that minorities are not welcome at the Port. I came there about five years ago and I found that the system that exists there, and in cases of engineers, the attitudes was that minorities were incompetent and they couldn't perform the kind of work, the

---

**18.** In contrast, the city of Richmond relied only on the disparity between the number of prime contracts awarded to minority firms and the minority population in the city as a whole. The city of Richmond, the Court added, "does not even know how many MBEs in the relevant market are qualified to undertake prime or subcontracting work in public construction projects ... nor does the city know what percentage of total city construction dollars minority firms now receive ..." *Croson*, 488 U.S. at 502, 109 S.Ct. at 725.

**19.** The HRC also discovered that the staff did not check the references for any of the other bidders on the contract.

highly technical work the Port produces." *Id.* at 31. She also testified that there was a general program of harassment of minority contractors by the staff at the Port, in an effort to discourage MBE/WBEs from bidding on contracts. *Id.* at 35–37.[20] One example she gave concerned an inspector on a construction contract who took three hundred photographs of a three week project. "[The inspector's] purpose for this [was] to try and throw the minority off the project by saying that he put too much water in the cement, et cetera. We found that was not the case. It's nothing but harassment." *Id.* In another example of harassment by city employees, a Latino construction contractor testified that he was told by an inspector that there were too many Hispanics on a MUNI (local railway) project and he was going to recommend that no more be hired. *Id.* at 47–48.

HRC officers and MBE/WBEs also gave examples of discrimination by white contractors. Numerous MBEs complained that white prime contractors would list them on their bid proposals but then replace them with white subcontractors upon being awarded the contract. *See e.g., id.* at 24–31. In other examples, MBEs were not taken on as sub-contractors by the majority primes even though they were the low bidders. *See e.g.,* Hearings, May 8 1989 at 15–18, 83–84. Another MBE testified that he called a white broker concerning construction work on a city project and was told that "we don't need any minorities." Hearings, April 24, 1989 at 30.

The city found that the weight of the evidence before it and the HRC in 1983, 1984, 1988, and 1989, supported the conclusion that the city had engaged in discriminatory practices with respect to minority contractors and that remedial action was warranted. Specifically, the Board of Supervisors found, among other things, that "the statistical disparities can only be attributed to *discriminatory procurement practices of the City* against MBEs and WBEs. SF Admin Code, Ch. 12D.2 (Finding 11) (emph. added); *see also, id.* at Ch. 12D.9(A)(2). The city also attributed the statistical disparities in part to discrimination in the private sector against MBEs and WBEs that is "manifested in and perpetuated and exacerbated by the City's procurement practices." *Id.* at Ch. 12D.2 (Finding 11).[21]

The city further concluded that "[t]he City's 'old boy network' constitutes a closed business system created and implemented by the City for all contracts, including those subject to the competitive bid process. *Discrimination against ... MBEs continue to persist in the City's procurement process* [sic]. The closed environment in which City businesses operate has excluded MBEs ... and has placed them under a competitive disadvantage when competing for City prime contracts." *Id.* at Ch. 12D.2 (Finding 10 (emph. added).[22]

These findings, supported by the statistical and other evidence, satisfy us that the city will likely demonstrate that it has a

**20.** "SUPERVISOR GONZALES: Do you know [of] other incident[s] of harassment?

MS JONES: Yes, I do. Every one of the projects that I've monitored there's been a case, there's been a minority, whether it was a prime minority or sub, has been a case of harassment....

SUPERVISOR GONZALES: So, in other words, that kind of harassment continues, even to this day?

MS JONES: Yes, it [does]." *Id.* at 34.

**21.** The parties dispute whether, under *Croson,* San Francisco can rely on evidence of discrimination in the private sector to support the need for the 1989 ordinance. We need not determine whether a city could rely only on such evidence, since San Francisco has found discrimination on its own part. However, we conclude that

evidence of discrimination in the private sector is relevant to the need for remedial action with respect to prime contractors. Allowing city construction project dollars to flow "through the local construction industry, [may make] the county a 'passive participant' in [discrimination]." *Coral Constr. Co.,* 729 F.Supp. at 738. For if the city supports private contractors that discriminate, this in turn may hinder the ability of MBEs to develop the necessary skills and experience to compete successfully as prime contractors.

**22.** These findings contrast sharply with the findings used to support the 1984 Ordinance. As the Ninth Circuit observed, those earlier findings did not address any prior discrimination by the city, but rather focussed on "historic discrimination." *AGCC–I,* 813 F.2d at 931–32.

"strong basis in evidence" for taking corrective action and that its asserted remedial purpose is genuine. *Croson*, 488 U.S. at 493, 500, 109 S.Ct. at 721, 724; *Cone*, 908 F.2d at 916 (testimony regarding complaints of discrimination combined with statistical disparities provided "more than enough evidence on the question of prior discrimination and need for racial classification to justify the denial of a motion for summary judgment [by challenger to MBE plan]"). Accordingly, plaintiff is not likely to prevail on its claim that the challenged portions of the 1989 Ordinance fail to serve a compelling state interest.

### B. *Narrowly tailored*

■ Besides serving a compelling state interest, race conscious remedies must be narrowly tailored to achieve that interest. As noted earlier, this requirement ensures that "there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493, 109 S.Ct. at 721. In *Croson*, the remedy selected was a requirement that non-MBE contractors subcontract at least 30 percent of the dollar amount of the contract to MBEs. *Id.* at 477, 109 S.Ct. at 712–13. Such a quota, the Court concluded, was not narrowly tailored to any goal, "except perhaps outright racial balancing." *Id.* at 507, 109 S.Ct. at 728.[23] In contrast, the five percent bidding preference adopted by San Francisco avoids any flat quota or set aside, imposes relatively little burden upon non-MBEs, and responds only to the identified discrimination.

As outlined earlier, the 1989 Ordinance excludes no one from bidding on any contract, and non-MBEs may invoke the exact same preference available to MBEs through a joint venture. In addition, non-MBEs have no settled expectation in attaining any given contract, and the effect of the preference, if any, is spread over a

large number of persons. In *Metro Broadcasting*, 110 S.Ct. at 3026, the Supreme Court recently observed that racial preferences in comparative hearings for FCC licenses contravene " 'no legitimate firmly rooted expectation[s]' " of competing applicants, thus rendering the burden on non-minorities "slight." We believe the same can be said here, particularly given that, in the past, non-MBEs "may have reaped competitive benefit over the years from the virtual exclusion of minority firms from ... contracting opportunities." *Fullilove*, 448 U.S. at 485, 100 S.Ct. at 2778.

Nor is there any indication that the 1989 ordinance is resulting in any actual undue burden. As noted earlier, during the first six months of its duration, the vast majority (92.7 percent) of all prime contract dollars awarded to San Francisco firms went to non-MBEs.[24] Nor has any member of plaintiff contended that it was denied a contract because of the MBE preference.

The form of the remedy also corresponds to the identified discrimination. The city found that its discriminatory procurement practices and an effective "old boys network" created a "competitive disadvantage" for MBEs. SF Admin. Code, Ch. 12D.2 (Findings 10–11). The bidding preference provides a modest "competitive plus" to offset this disadvantage and nothing more. *Id.* (Finding 7). Moreover, unlike the Richmond plan, which improperly linked its remedy to general population statistics, *Croson*, 488 U.S. at 507, 109 S.Ct. at 728, the five percent bidding preference was selected in light of MBE availability figures (23.6 percent for Asian construction firms, 13.37 percent for Black, and 11 percent for Hispanic). *See* Exh. A, Plaintiff's Opening Brief (Defendant's Response to Interrogatory No. 7); *cf., Cone Corp.*, 908 F.2d at 914 (narrowly tailored plan must further some goal "other than outright ra-

---

**23.** During the five year period from 1978 to 1983, 0.67 percent of the city of Richmond's prime construction contracts had been awarded to MBEs, although Richmond's population was 50 percent Black. *Croson*, 488 U.S. at 479, 109 S.Ct. at 714.

**24.** Plaintiff suggests that these figures demonstrate that the 1989 Ordinance is not narrowly

tailored because, at least so far, it has not achieved its purpose of significantly increasing the number of prime contracts awarded to MBEs. However, the dearth of MBE contracts may be more of an indication that the remedy chosen, if anything, is too narrow to achieve its remedial goal, rather than not narrow enough.

cial balancing"); *Contractors Ass'n of Eastern Pa., Inc. v. City of Philadelphia,* 735 F.Supp. 1274, 1298 (E.D.Pa.1990) (MBE plan not narrowly tailored given that 15 percent set aside was an admittedly arbitrary choice and city "did not even know the number of capable MBEs existing in the Philadelphia area").

The "competitive plus" is also limited to those qualifying MBEs that are economically disadvantaged.[25] SF Admin Code, Chs. 12D.4, 12D.5 (definition of "MBE"). As the Eleventh Circuit recently noted, targeting the remedy in this manner helps ensure that "its benefits [go] to those MBEs most likely to have been discriminated against ..." since larger, more successful firms are more likely to have overcome the effects of discrimination than smaller, struggling ones. *Cone Corp.,* 908 F.2d at 917.

The remedy is circumscribed in other ways as well. It is limited to MBEs in San Francisco, and thus avoids extending its benefits to groups not shown to have been subjected to discriminatory practices. SF Admin Code, Ch. 12D.5 (definitions of MBE and Local Business); *cf., Croson,* 488 U.S. at 508, 109 S.Ct. at 729 (Richmond plan granting preference to MBE anywhere in the country obviously not narrowly tailored). It also limits its reach to specific minority groups for which the evidence supported a finding of discrimination— Asians, Blacks, and Hispanics. *Cf.; Croson,* 488 U.S. at 506, 109 S.Ct. at 727–728 (criticizing the Richmond plan for the "random inclusion" of racial groups that may never have suffered from discrimination in the Richmond city construction industry).

Bid preferences are also limited to those particular types of contracts for which evidence of discrimination was found. For example, the bid preference does *not* apply to Asian or Hispanic architectural/engineering firms, Hispanic computer system or management consultant firms, or Black

medical services firms. SF. Admin. Code, Ch. 12D.11(A)(3)–(A)(6).

The 1989 Ordinance is also of very limited duration (three years), and provides for waiver of the bid preferences under certain circumstances. SF Admin Code, Chs. 12D.13, 12D.15(E). It also directs the HRC to provide for administrative procedures allowing any business to directly file a complaint requesting that the bid preference not be applied to that industry (e.g. construction industry) because MBE participation in city prime contracts has reached parity with their number in the relevant industry community and MBEs no longer suffer from a discrimination induced competitive disadvantage. SF Admin Code, Ch. 12D.6(A)(4); Rosales Decl. in Opposition to Application for TRO, Exh. A.

Plaintiff objects that the city did not sufficiently consider race neutral alternatives. *Croson,* 488 U.S. at 507, 109 S.Ct. at 728 (Richmond plan not narrowly tailored given failure to consider race neutral alternatives). As noted earlier, the city initially sought to address the problem of discrimination in the realm of city contracts with legislation that prohibited discrimination in employment; the HRC staff has also intervened and mediated complaints of discrimination brought to its attention, *see e.g.,* Hearings, April 24, 1989 at 16–17 (testimony of HRC Director Peter Jamero). However, these efforts failed to reduce complaints of discrimination, and did not ameliorate the discriminatory procurement practices of the city.[26] The city also considered whether to "(1) create a special revolving fund to assist newly established MBEs and WBEs to meet bonding and other fee-related requirements; and (2) relax or waive bonding requirements on certain contracts to facilitate MBE/WBE participation." SF Admin. Code, Ch. 12D.2 (Finding 13). However, the city concluded that these were not viable options. "In

---

**25.** An economically disadvantaged business is any business whose "average gross annual receipts in the three fiscal years immediately preceding its application for certification as a MBE or WBE does not exceed the following limits: (1) Public Works/Construction—$14 million; (2) Goods/Materials and General Services Sup-

pliers—$2 million; (3) Professional Services—$2 million." SF Admin Code, Ch. 12D.5

**26.** Pursuant to San Francisco city charter section 3.501, the Board of Supervisors lacks authority to terminate or otherwise discipline city staff. Rather, this authority is exclusively vested in the head of each city department.

view of the City's budgetary constraints and the opposition voiced by segments of the local business community, this Board finds that creation of a special revolving fund, or relaxation or waiver of bonding requirements is not feasible at this time." *Id.; see also,* Hearings, April 24, 1989, at 22–24, and May 8, 1989 at 37; Cal. Const. Art. XVI, § 6 (prohibiting gifts or loans of public monies or pledging of credit prohibited); *cf., Contractors Ass'n of Eastern Pa. Inc.,* 735 F.Supp. at 1298 (MBE plan not narrowly tailored given city's failure to investigate race neutral alternatives and reject them as "not viable or practical").

Plaintiff also contends that the bid preference is not "narrowly tailored" because it is not limited to actual past victims of discrimination, emphasizing the court's observation in *Croson* that the Richmond plan failed to provide for any "inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors." 488 U.S. at 508, 109 S.Ct. at 729. This observation was made in the context of the court's strong reaction to the Richmond plan's rigid 30 percent quota—a quota which granted an "absolute preference" to MBEs anywhere in the country based solely on race and without any demonstration that remedial action was necessary. *Id.* We decline to read this language as precluding local governments from *ever* utilizing *any* type of race conscious remedy to serve the compelling state interest of remedying the effects of identified discrimination—particularly where, in contrast to the Richmond plan, the remedy is limited to a discrete group, which the city admits to discriminating against, and the remedy is narrowly tailored to rectify the identified discrimination. Concluding otherwise would, in fact, inexplicably nullify the court's subsequent

comment that "[i]n the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion." *Id.* at 509, 109 S.Ct. at 729.[27]

As that comment indicates, the Court left open the possibility of voluntary city sponsored race conscious remedies under *some* circumstances; *see also, Wygant,* 476 U.S. at 287, 106 S.Ct. at 1854 ("[The *Wygant* court has] agreed that a plan need not be limited to the remedying of specific instances of identified discrimination for it to be deemed sufficiently 'narrowly tailored'") (O'Connor, J. concurring). Yet, an iron clad requirement limiting any remedy to individuals personally proven to have suffered prior discrimination would render any race conscious remedy superfluous. For such a remedy could be applied solely on the basis of the beneficiary's status as a "past victim" and without reference to any racial classification at all. In other words, "[a] remedy that goes to the actual victim is not race-conscious at all, it is victim-conscious." Fried, *Affirmative Action After City of Richmond v. J.A. Croson Co.: A Response to the Scholars' Statement,* 99 Yale L.J. 155, 161 (1989).[28]

In sum, the modest five percent bidding preference enacted by San Francisco is of a wholly different nature than the outcome-determinative, "grossly overinclusive" legislation enacted by the city of Richmond. *Croson,* 488 U.S. at 506, 109 S.Ct. at 728. For the reasons discussed above, the 1989 Ordinance's scaled-down, measured approach appears to preclude the "possibility that the motive for the classification was illegitimate racial prejudice or stereotype," *Croson,* 488 U.S. at 493, 109 S.Ct. at 721, rather than remedial. Thus, we conclude that plaintiff has not shown that it is likely

---

27. *See also, id.* ("Moreover, evidence of a pattern of individual discriminatory acts can, if supported by appropriate statistical proof, lend support to a local government's determination that broader remedial relief is justified"); note 13, *supra.*

28. While we conclude, for the reasons set forth above, that *Croson,* does not preclude all race conscious relief, with respect to municipal actors, we note that in both the *Fullilove* and the

*Coral Constr. Co.* cases, the respective governmental entities included a waiver provision that allowed them to waive a preference where a bidding MBEs higher price was not attributable to the effects of past discrimination. *See Croson,* 488 U.S. at 508, 109 S.Ct. at 728. While its absence may not be fatal to the 1989 Ordinance, its inclusion would further strengthen San Francisco's position that its remedy is narrowly tailored.

to succeed on its contention that San Francisco's plan is insufficiently tailored to satisfy the strictures of the equal protection clause of the fourteenth amendment.

## IV. CONCLUSION

Plaintiff has not persuaded this court that it is likely to succeed on its claim that the 1989 Ordinance fails to serve the compelling interest of remedying the effects of past discrimination by the city of San Francisco against San Francisco based MBEs, or its claim that challenged portions of the Ordinance are not narrowly tailored to that goal. This assessment of plaintiff's constitutional claim also leads us to conclude that plaintiff has not demonstrated a sufficient threat of irreparable injury to warrant a mandatory injunction at this juncture. Nor has plaintiff demonstrated that the balance of hardships tips sharply in its favor. Accordingly, plaintiff's motion for an order preliminarily enjoining the challenged provisions of the 1989 Ordinance is denied.

IT IS SO ORDERED.